## JAMES PHELPS *et al. versus* CALVIN WILLARD.

The plaintiffs, machinists in Connecticut, contracted to furnish B with a paper-making machine, to be put up by them in B's mill in Worcester, and if it worked to B's satisfaction he was to pay for it, otherwise the plaintiffs were to take it away. It weighed about eight tons, and B was to cart it from Connecticut to Worcester The plaintiffs accordingly set it up in a new mill adapted purposely to the dimensions and structure of the machine, and before the setting up of the machine was completed and while some of its essential parts were wanting, it was put in operation for experiment, but it did not work advantageously and to the satisfaction of B ; and on the same day on which this trial was made it was attached as the property of B. *Held*, that the property had not been transferred to B.

*Held*, also, that the plaintiffs had possession to an extent sufficient to enable them to maintain trespass against the attaching officer for taking the machine.

TRESPASS *de bonis asportatis* brought by the plaintiffs, Phelps and Spofford, who were machinists residing at Windham, in Connecticut, against the defendant as sheriff of the county of Worcester, for taking a cylinder paper-making machine and dryer, with apparatus, of the value of $2260.

The defendant pleaded the general issue, and filed a brief statement setting forth a writ in favor of the Worcester County Institution for Savings against Elijah Burbank, Gardner Burbank, and Caleb Burbank, and an attachment thereon of the property described, by one of the defendant's deputies, as the property of Elijah Burbank.

At the trial, before *Shaw* C. J., the plaintiffs, to prove property, called as a witness Gardner Burbank, who testified to the following effect : — I was agent for my father, Elijah Burbank, paper-maker in Worcester. In the winter of 1832, we agreed with Phelps for a cylinder paper-making machine, to be put up at our works, and if it worked to our satisfaction, we would pay him his price ; otherwise he was to take it

away. He was to send men to put it up and see that it operated well, otherwise we were under no obligation to take it.. We were to cart it from Windham, in addition to the cost, but when carted up he was to send his own machinist to set it up. We took the different parts as they were ready. It weighed about eight tons. We commenced working it before all the material parts were brought up. The day the machine was attached, (which was Saturday, about dark,) was the first day that we made paper upon it, and run it through. The operation was imperfect. The parts which constituted the cutting machine were wanting, and the cylinder and arbors which moved them. We had sent a man for them, who returned the same evening (after the attachment) without them. They were forwarded afterwards. Some guide straps and guide rolls were also wanting. These were indispensable articles, and Brown, the mill-wright, who was at our mill in the employment of the plaintiffs, was sent for them, and we instructed him to ask Phelps to come up. Three others of the plaintiffs' men had been at our mill, but in consequence of the necessity of replacing a boiler, they went away for a few days, during which the work in setting up the machine was suspended. We wanted Phelps's instruction as to the best mode of putting it into operation. There were some cone pullies which required to be essentially altered, and one of the press rolls required to be exchanged. On Saturday, at the first trial, it did not make paper good for any thing. After the attachment there was about 1000 pounds of pulp which it was found would spoil if not worked up, and the machine was run a short time by our men, under the direction of the officer, and by some arrangement between him and the creditors. After about a fortnight we resumed working it, and it was a week or ten days after we resumed it, before it made good work. We never made any settlement with Phelps for the machine. At the first trial the machine was far from being acceptable, but I always had faith that it would ultimately operate and make good paper. It has since operated well and satisfactorily. A great many alterations have been made. Brown soon left, and since that we have man aged with our men, under the advice of Phelps. The plain

'iffs have not been employed on the machine, since the attachment; Phelps has been at the mill and given us some instructions, and the alterations were made by our men. A new mill, or an addition to an existing mill, was built by Elijah Burbank, and the mill-wright work therein was done by the plaintiffs. The dimensions and structure of the mill were adapted to those of the machine. The machine was set up in this mill, and was geared to the wheels of the mill by drums and bands, or other common gearing.

The defendant contended, that the facts prove a delivery, which vested the property in Burbank and rendered it liable to attachment.

The chief justice said he should instruct the jury, that they would consider what the contract was; if it was, to make a machine and set it up in Burbank's works, and if on trial it worked to his satisfaction it was to be paid for, otherwise the plaintiffs were to take it away, then the jury would consider, whether the contract had been executed according to its terms; that if the machine had been accepted by Burbank, then the property passed under the contract and was rightfully attached as his, otherwise not; that the setting up the machine in Burbank's works did not constitute such a delivery, under the circumstances, as to pass the property, without acceptance; and that if an acceptance was negatived by the evidence, the property was not liable to be attached as Burbank's.

On the point, whether the plaintiffs had the right of possession, it was stated by the chief justice as the general rule, that when the right of the owner's possession of personal property is not divested or suspended by contract or usage, the right of possession follows the right of property; that under the circumstances of this case, until the right of property was changed, the right of possession was in the plaintiffs, and they could maintain an action of trespass.

The defendant then became defaulted, the case being re- served in the same manner as if there had been a demurrer to the evidence, or as if there had been a verdict for the plain- tiffs and a motion to set it aside for misdirection in point of law, or as a verdict without sufficient evidence to support it.

J. Davis, Newton, Washburn, and W. Lincoln, for the

Oct. 3d

defendant, insisted that there was an absolute transfer of the property to Burbank ; and if not, that he was in possession of the machine and had a right, by contract, to retain it a reasonable time, and a reasonable time had not elapsed, and therefore trespass would not lie.   To this last point he cited *Ward* v. *Macauley*, 4 T. R. 489 ; *Gordon* v. *Harper*, 7 T. R. 9 2 Wms's Saund. 47 *b*, note ; *Squire* v. *Hollenbeck*, 9 Pick 552 ; *Woodruff* v. *Halsey*, 8 Pick. 335 ; *Ayer* v. *Bartlett*, 9 Pick. 156.

*Hoar* and *Barton*, for the plaintiffs, cited on the last point 3 Stark. Evid. 1438 ; 2 Wms's Saund. 47, note ; Bac. Abr *Trespass*, *C* 2 ; *Walcot* v. *Pomeroy*, 2 Pick. 121 ; *Ludden* v. *Leavitt*, 9 Mass. R. 104 ; *Bond* v. *Padelford*, 13 Mass. R. 394.

*Oct. 7th.*    *Per Curiam.*   The first and the most important question in the case relates to the property in the machine.   It was a structure of great weight and could not be finished by the plaintiffs at their own building, but must have been in the same local situation before as after a delivery ; and when completed, no actual and perhaps no symbolical delivery would have been necessary.   The parts were to be removed by Burbank to his works, but the possession for that purpose was not a delivery The plaintiffs' workmen were to follow the machine to Burbank's land, and there complete it, and they accordingly did so, and nearly finished it before the attachment.   It was put in operation as an experiment, and operated to some extent, but important parts were wanting to make it work advantageously.   The plaintiffs would not have been justified in offering it to Burbank as finished ; and if they had refused to complete it, Burbank could not have maintained trover for it, but his remedy would have been on his contract.   On the whole, we are all satisfied that the evidence did not show a transfer of the property to Burbank.

The other question is, whether an action of trespass will lie for the plaintiffs.   The objection on the part of the defendant is, that they had not such possession as will enable them to maintain the action.   We have not deemed this point to be so clear as the main point.   The machine was in the building of Burbank, which was in his possession.   Accord-

ng to his agreement, however, the plaintiffs had a right to go there to finish the machine, and he could not maintain trespass *quare clausum* against them. We think that it was so far within the control and in the possession of the plaintiffs, under their contract and the permission of Burbank, that the action will lie. If a watchmaker puts up a clock in a house, under an agreement that if it shall keep good time the owner of the house will purchase it, we think that, until the trial is made, the watchmaker remains in possession so as to be able to maintain trespass.

*Phelps*
*v.*
*Willard.*

*Judgment for the plaintiffs.*